In re Christopher PILAVIS, Debtor.

Richard A. Campana, Plaintiff,

v.

Christopher Pilavis and Troula
Pilavis, Defendants.

Bankruptcy No. 98–13074–WCH.
Adversary No. 98–1995.

United States Bankruptcy Court,
D. Massachusetts.

May 3, 1999.

Christopher Pilavis, debtor pro se.

Evan Pilavis, Malden, MA, for Troula Pilavis.

Frederic D. Grant, John T. Morrier, Grant & Roddy, Boston, MA, for Richard A. Campana.

## DECISION

WILLIAM C. HILLMAN, Chief Judge.

In this convoluted and bitterly contested matter, Richard A. Campana ("Plaintiff") seeks to avoid certain transfers made by

Christopher Pilavis ("Debtor") to Troula Pilavis ("Defendant") and to impose an equitable mortgage on one of the parcels involved. This is a core proceeding. 28 U.S.C. § 157(b)(2)(H), (O). After a two-day trial,[1] I took the matter under advisement.

The following constitute my findings of fact and conclusions of law.

## PLAINTIFF'S STANDING

None of the parties raised the issue of whether Plaintiff is the proper plaintiff in this action. Although I conclude that he is the proper plaintiff, it is necessary to explain the conclusion.

After Debtor filed for relief, Plaintiff filed a Notice of Removal ("Notice") of the fraudulent conveyance action which he had filed against Debtor and Defendant in state court. In addition to the Debtor, Plaintiff served a copy of the Notice on the Chapter 7 trustee (the "Trustee"). In the Notice, Plaintiff made the following representations with respect to the jurisdiction of this Court:

9. The Fraudulent Conveyance Action, which seeks to avoid the transfer of property by the Debtor (Bankruptcy Code § 541), directly affects the Debtor's estate and is a matter within this Court's jurisdiction. 28 U.S.C. § 157(b)(2)(H).

10. Upon removal to this court, the Fraudulent Conveyance Action is a core proceeding.

11. This Court has jurisdiction of the Fraudulent Conveyance Action pursuant to 28 U.S.C. § 1334 and the action may be removed to this Court pursuant to 28 U.S.C. § 1452 and Fed.R.Bankr.P. 9027.

Debtor responded as follows:

9. Denied. By way of further answer, the Debtor states that the Fraudulent Conveyance Action is based on the bias and erroneous rulings, findings and or-ders of Judge Julian Houston in the Middlesex Superior Court Case titled Campana individually and as Executor v. Pilavis C.A. No. 90–3274–B. The afore-mentioned judgment has been appealed by the Debtor to the Appeals Court, Case No. CA–98–P–588. [footnote omitted]

10. Denied. The Fraudulent Conveyance Action is not a core action since its viability is entirely dependent on the decision of the Appeals Court and particularly, its determination whether Campana is, indeed a judgment creditor.

11. Denied. By way of further answer, the notice to remove is an act prohibited by the stay since its only purpose is to delay the bankruptcy process by removal of an action that is premature and/or to force the Debtor to a settlement by borrowing and/or to force a pre-petition judgment under appeal by the Fraudulent Conveyance Action.

■ Neither Debtor nor the Trustee disputes the fact that the fraudulent conveyance action became property of the estate when Debtor filed for relief. Accordingly, the Trustee became the proper party to prosecute the action.

■ The propriety of Plaintiff continuing as plaintiff is supported by the following analysis:

The Bankruptcy Code does not specifically enable an individual creditor to pursue a claim on the estate's behalf in a Chapter 7 case. *In re United Stairs Corp.*, 176 B.R. 359, 366 (Bankr.D.N.J. 1995).

When the trustee or debtor in possession unjustifiably refuses to act, however, courts have allowed the official creditors' committee or other appropriately designated party to bring suit on behalf of the estate. *Unsecured Creditors Committee v. Noyes (In re STN Enter.)*, 779 F.2d 901, 904 (2d Cir.1985). An

---

1. Defendant claimed a trial by jury in the Superior court and renewed that claim before me. I ruled that she was not entitled to a jury trial and a non-jury trial was held. *See Campana v. Pilavis (In re Pilavis)*, 228 B.R. 808 (Bankr.D.Mass.1999).

individual creditor has been permitted to bring suit to set aside a transfer upon a showing that the trustee lacked funds and therefore refused to file the suit. *William B. Tanner Co. v. United States (In re Automated Bus. Sys., Inc.)*, 642 F.2d 200 (6th Cir.1981). . . .

In *STN*, a chapter 11 case, the Second Circuit directed courts considering whether to allow creditors' committees to bring suit whether the suit presented 'a colorable claim or claims for relief that on appropriate proof would support a recovery.' *STN*, 779 F.2d at 905. Second, courts are to consider, in deciding if the debtor or trustee unjustifiably failed to bring suit, whether the action is likely to benefit the estate. *Id.* . . .

Because the suit presents colorable claims for relief; because Trustee would have failed to pursue the suit without the assistance of BNP and because there is no net financial burden on the bankruptcy estate, BNP is entitled to standing under *STN*.

*Glinka v. Abraham and Rose Co., Ltd.*, 199 B.R. 484, 493–4 (D.Vt.1996).

■ I agree with and adopt the legal conclusions of the *Glinka* court. Further, I conclude that the facts in this case warrant the same conclusion. This adversary proceeding presents colorable claims for relief. Based upon the Trustee's knowledge of the case and her failure to intervene and the fact that at present this appears to be a no-asset case, I find that the Trustee would have failed to pursue the case without Plaintiff. Lastly, because the litigation presents no burden to the estate and, if successful would benefit *the*

*estate*, Plaintiff is the proper plaintiff in this action.

## FINDINGS OF FACT

Debtor is a lawyer. Plaintiff was his client. As a result of certain dealing between the parties between 1981 and 1990,[2] Plaintiff made demand on Defendant on March 24, 1990[3] and brought suit against Debtor in state court (the "Superior Court") on May 11, 1990.[4] The Superior Court had approved attachments upon real estate owned by the Debtor on May 11, 1990 and April 25, 1994.[5] On June 22, 1995 the state court entered judgment for the Plaintiff in the amount of $592,032.03.[6] That sum includes damages for breach of a contingent fee agreement between the parties; damages for violation of Mass.Gen. Laws ch. 93A in connection therewith; damages in connection with the sale of certain stock by Debtor to Plaintiff; and damages in connection with a false estate tax abatement claim prepared by Debtor for Plaintiff in his capacity as executor of his mother's estate.[7] Certain orders of the superior court in that case are currently on appeal.[8] Plaintiff commenced the present action in the superior court on December 4, 1996 and filed the Notice on July 1, 1998.[9]

### The Warren Property

On December 9, 1986, Debtor and Defendant acquired approximately 23 acres of land in Warren, Massachusetts (the "Warren Property") as joint tenants.[10] They obtained the purchase price ($25,900[11]) by granting a second mortgage on other jointly owned property.[12] They subsequently

2. Joint Pretrial Statement, Agreed Statement of Facts, ¶ 2 ("PTS ¶ 2").

3. Plaintiff Ex. 2, p. 4.

4. PTS ¶ 3

5. PTS ¶¶ 9, 10.

6. PTS ¶¶ 1, 5.

7. Plaintiff's Ex. 1.

8. PTS ¶ 7. No details concerning the matters on appeal were made part of the record.

9. PTS ¶¶ 11, 12.

10. PTS ¶¶ 13, 14; Plaintiff Ex. 3.

11. 2T–89.

12. 2T–65–66; Defendant Ex. 11.

conveyed about one acre of the Warren Property,[13] receiving a price of $22,000 on August 5, 1987.[14] Plaintiff attached Debtor's interest in the remaining Warren Property on May 15, 1990.[15]

On December 5, 1990, Debtor recorded a quitclaim deed conveying his interest in the Warren Property to Defendant without consideration.[16] That deed was dated January 3, 1990.[17] Debtor testified that Defendant demanded the transfer at the time that the deed was executed because she was told of claims against Debtor by other clients, and she feared attachment of the Warren Property.[18] Plaintiff attached the Warren Property again, as standing in the name of Defendant, on March 15, 1995, this time to the value of $500,000.[19]

While there have been no further recorded conveyances of the Warren Property, the Separation Agreement between the parties, discussed below, purported to set off to Debtor 20 acres thereof, and he scheduled ownership of that portion of the Warren Property in his bankruptcy filing, showing it as subject to $590,000 in attachments.[20] Debtor testified that the transfer into his name has not been made because of subdivision regulations in the town.[21]

### The Yarmouth Property

On April 17, 1980, a deed conveyed certain property in Yarmouth, Massachusetts (the "Yarmouth Property"), to Debtor and Defendant as tenants by the entirety.[22] The Debtor filed the mortgage application as "Borrower" and the application sections dealing with any "Co–Borrower" were left blank.[23] The application did specify that title would be held in the name of Troula Pilavis individually.[24] The real estate agent involved in the acquisition testified that it was to be Defendant's property.[25] He also testified that at the closing Defendant "made a ruckus" because the deed erroneously listed both Debtor and Defendant as the grantees.[26] While Debtor repeatedly argued in his opening that the equity in the property was obtained in part with funds advanced by Defendant's brother and father,[27] no evidence to that effect was introduced. The mortgage was paid off in 1985[28] and a contemporaneous endorsement to the insurance coverage of the property indicates that the insured was Defendant.[29] Debtor testified that Plaintiff was well aware of the misplaced title to the Yarmouth Property and would joke with Defendant and Debtor about the situation.[30]

Based upon all of the evidence introduced concerning the acquisition of the Yarmouth Property, I find as a fact that title to this property was supposed to have been taken in the name of Defendant and that the it was property of Defendant in which Debtor had no interest, notwithstanding his record title. As a result

---

13. PTS ¶ 15.

14. 2T–89.

15. PTS ¶ 16. The attachment has since been duly carried forward on the records of the Worcester Registry. PTS ¶ 17.

16. PTS ¶ 18; Plaintiff Ex. 4.

17. *Id.*

18. 2T–68. This evidence was undisputed.

19. PTS ¶ 20.

20. PTS ¶¶ 21, 23, 24.

21. 2T–66–67.

22. PTS ¶ 25; Plaintiff Ex. 5.

23. Defendant Ex. 2.

24. *Id.*

25. Transcript, Vol. 1, pages 84, 86 ("1T–84, 86").

26. 1T–87. *See also* 2T–72–73.

27. 1T–11, 67, 72, 79.

28. Defendant Ex. 1.

29. Defendant Ex. 5. *See also* 2T–74.

30. 2T–75*ff.*

Debtor could not fraudulently convey it and the quitclaim deed from Debtor to Defendant[31] was merely confirmatory of the actual interests in the Yarmouth Property.[32] There was no fraudulent transfer of the Yarmouth Property from Debtor to Defendant. Judgment will enter against the Plaintiff as to that property.

*The Medford Property*

Debtor and Defendant acquired their marital home in Medford as tenants by the entirety on June 17, 1963 (the "Medford Property").[33] Plaintiff attached the interest of Debtor in the Medford Property in 1990 and 1994.[34]

On October 23, 1997, Debtor recorded a quitclaim deed of the Medford Property to Defendant "pursuant to a divorce decree dated February 18, 1997".[35] The deed is dated March 20, 1997.[36] The Medford Property is not listed in Debtor's schedules which he filed just over a year after the recording of the deed.[37] I will accept the only evidence of value, which was that the Medford Property had $100,000 in equity at that time,[38] as against a total value of $225,000.[39]

*The Divorce*

Debtor and Defendant testified that, as a result of domestic disagreements, they agreed upon a divorce in 1997.[40] On January 24, 1997 Debtor and Defendant entered into a Separation Agreement.[41] The Debtor represented himself and his son, Evan James Pilavis ("Evan"), represented Defendant, his mother.[42] The Separation Agreement recited that "a Complaint for Divorces [sic] is in the process of being filed in the Middlesex County Probate and Family Court."[43] It also provided for distribution of the assets remaining in question here, the Warren and Medford Properties, as follows:

The parties agree that title to the Marital Home should be solely in the name of the Wife, given the many years of service running the home, managing the budget and paying the bills, rearing the children and being the Husband's legal typist, for which she has never been paid.

. . . .

The [Warren Property] consists of three (3) lots. Lots two (2) and (4) consist of one acre plus each. Lot one (1) consists about twenty (20) acres. The parties agree to petition [sic] their undivided one half interest as tenants in common [sic] in the three lots as follows: ... Title in lots Two (2) and Four (4) to vest solely in the Wife.... Title in Lot One (1) to vest solely in the Husband.[44]

Under the further terms of the Separation Agreement, Debtor was permitted to reside in the Medford Property until De-

---

**31.** Plaintiff Ex. 7; Defendant Ex. 7.

**32.** As a result, the dispute concerning the dates of execution and recording of the deed becomes irrelevant.

**33.** PTS ¶¶ 35, 36; Plaintiff Ex. 8.

**34.** PTS ¶¶ 37–39; Defendant Ex. 14.

**35.** PTS ¶ 40; Plaintiff Ex. 9; Defendant Ex. 10.

**36.** PTS ¶ 41; Plaintiff Ex. 9.

**37.** PTS ¶¶ 42, 44.

**38.** 2T–71–71, 88. It is not clear from the testimony whether Debtor was valuing his interest only or the total value of the Medford Property over its mortgages. I will adopt the former for purposes of this analysis.

**39.** 2T–89.

**40.** 2T–109.

**41.** Plaintiff Ex. 11.

**42.** 2T–80. The pleadings in this case indicate that Debtor and Evan have a common law office address but there is no evidence of any sharing beyond the street address in the practice of law.

**43.** Plaintiff Ex. 11.

**44.** Plaintiff Ex 11.

fendant returned from her trip to Greece.[45] (Debtor then removed his residence to an apartment owned by his former mother-in-law, which she allowed him to use.[46])

In fact, Defendant and Debtor never commenced divorce proceedings in Middlesex County. Defendant obtained a decree of divorce from a court in the Dominican Republic.[47] Debtor explained the change of plans as follows:

Q. Do you know why this divorce was not filed in Middlesex County?

A. Several reasons. She—I told her that I would be stressed out because I knew most of the judges there and most of the lawyers that practice there. And I think that it was also your [Evan's] feeling, if I remember correctly, that you practiced there and you would rather not have us go through that court. Her feelings were she didn't want to wait the waiting period and suffer through this. She just wanted to put it behind her and wanted to take her trip [to Greece].[48]

Debtor executed a power of attorney to a Dominican lawyer to represent him in proceedings there.[49] On February 18, 1997, the divorce decree (the "Decree") was entered in the Dominican Republic.[50] It recognized that both of the parties were residents and domicilliaries of the Commonwealth of Massachusetts and ordered that "the distribution of all their belongings will be done according to the inventary [sic] and agreement done between the couple . . . dated January 24, 1997." [51]

## DISCUSSION

### The Chronology and the Debtor's Solvency

This litigation seeks to set aside certain transfers made by Debtor to Defendant as fraudulent. In connection with the arguments which the parties have advanced in that regard, it is necessary to determine whether the Debtor was solvent at specific time and, if then solvent, whether the particular conveyance rendered him insolvent.[52]

I hold that, for purposes of both the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act (whose applicability is discussed below), the Plaintiff's claim against Debtor arose when it was first asserted. The earliest evidence of that fact is the letter dated March 24, 1990 in which the Plaintiff asserted rights against the Debtor.[53]

■ As a preliminary matter, I must evaluate Plaintiff's claim. The law regarding the status of pending claims for purposes of fraudulent transfer and conveyance statutes is well summarized in *Tri–Continental Leasing Corp. v. Zimmerman*, 485 F.Supp. 495 (N.D.Cal.1980). In brief, Judge Wollenberg held that for purposes of determining solvency an asserted unliquidated claim must be valued at its "probable ultimate liability", 485 F.Supp. at 499, and endorsed hindsight from a subsequently rendered judgment as a guide to valuation. 485 F.Supp. at 500. *See also Lassman v. Goldstein (In re*

---

**45.** Plaintiff Ex. 11.

**46.** 2T–82.

**47.** Plaintiff Ex. 12, 13.

**48.** 2T–80. Defendant's testimony is to the same effect. 2T–110.

**49.** *Id.*

**50.** Plaintiff Ex. 12. This exhibit is a certified translation of the original and reference is made to it for convenience.

**51.** *Id.*

**52.** Plaintiff argues in his post-trial brief that once inadequate consideration is shown, the burden of proving the Debtor's solvency shifts to him, citing *First Federal Savings & Loan Ass'n v. Napoleon*, 428 Mass. 371, 701 N.E.2d 350 (1998). I do not agree with his interpretation of that case, which I read as saying, in dicta, that the plaintiff must make a prima facie case of insolvency before the burden shifts.

**53.** Plaintiff Ex. 2, p. 4.

*Goldstein*), 194 B.R. 1 (Bankr.D.Mass. 1996). I endorse and will follow that approach. As a result, I value the Plaintiff's claim at the judgment amount of $227,-816.[54]

I begin with a base line of January 1, 1990. At that time, ignoring some minor assets,[55] Debtor owned an interest in the Medford Property as a tenant by the entirety[56] with Defendant and an interest in the Warren Property as a joint tenant with her.[57] Debtor had an equity interest of $100,000 in the Medford Property. He valued the Warren Property at "maybe $80,000"[58] at that time, giving Debtor's interest a value of $40,000. As Debtor's uncontradicted testimony was that he then had no significant debts, other than the mortgage indebtedness secured by the Medford Property, I conclude that Debtor had a net worth of $140,000 on January 1, 1990.[59]

 As noted in the finding above, Debtor executed a deed to Defendant of his interest in the Warren Property on January 3, 1990. The deed was not recorded until December 5, 1990. Inasmuch as Plaintiff's claim arose between the date of execution and the date of recording, it is necessary to determine when the allegedly fraudulent conveyance occurred. Plaintiff urges that the transfer did not occur until the deed was recorded, at which point it would be valid against a good faith purchaser for value, citing § 6(1)(i) of the Uniform Fraudulent Transfer Act, adopted in Massachusetts as Mass.Gen.Laws ch. 109A § 7(1)(i), and several ancient cases that support the position that a conveyance is valid against third parties only upon recordation.[60] Because of a change in Massachusetts law, it is necessary to look at the conveyance of the Warren Property separately from the conveyance of the Medford Property for this purpose.

At the time of the transfer of the Warren Property, the applicable Massachusetts law was the Uniform Fraudulent Conveyance Act ("UFCA"), then codified as Chapter 109A of the General Laws.[61] That statute does not define "transfer." Absent a statutory definition, resort must be had to the common law for an interpretation of the term.

At common law an unrecorded deed passed the estate presently and was a valid conveyance as against the grantor without recording. *Dole v. Thurlow*, 53 Mass. (12 Metc.) 157, 162 (1846) ("This precise point was decided in an early case, and, it is believed, has ever since been regarded as the settled law.") *See also Cooper v. Monroe*, 237 Mass. 192, 198, 129 N.E. 436, 437 (1921). The same result is reached through study of the basic real estate statutes:

A deed executed and delivered by the person, or by the attorney of the person, having authority therefor, shall subject to the limitations of section four, be

---

54. Plaintiff Ex. 1.

55. Debtor testified that he also owned certain other assets, such as the Loon Mountain timeshares, 2T–15–17, bank accounts, 2T–21, and an automobile. 2T–18. All of the valuations given for those assets were guesses and estimates and no basis was provided to support the amounts stated. In any event, the aggregate valuations given, even if credited to the asset side of the Debtor's balance sheet, are insufficient to affect the calculations which follow.

56. Plaintiff Ex. 8.

57. Plaintiff Ex. 3.

58. 2T–88, 89.

59. Using an assets-vs.-liabilities approach to solvency is consistent with both the Uniform Fraudulent Conveyance Act, § 2(1), and the Uniform Fraudulent Transfer Act, § 3(a). As will be seen in the discussion which follows, both are relevant here.

60. *Kellogg v. Loomis*, 82 Mass. 48, 49 (1860); *Aronian v. Asadoorian*, 315 Mass. 274, 276, 52 N.E.2d 397, 398 (1943).

61. *See Carpenter v. Granderson* (In re *Granderson*), 214 B.R. 671 (Bankr.D.Mass.1997).

sufficient, without any other act or ceremony, to convey land.

Mass.Gen.Laws ch. 183, § 1.

The limitation of the section four invalidates unrecorded deeds and leases as "against any person, *except the grantor or lessor.*" Mass.Gen.Laws ch. 183, § 4 (emphasis added).

I hold the transfer of the Warren Property was effective on January 3, 1990, the date of execution of the deed. Plaintiff's demand was made on March 24 of that year. I find that Debtor was solvent at the time of the conveyance of the Warren Property to Defendant. As the value of the Plaintiff's claim was $227,816, Debtor was insolvent once that claim had been asserted.

The only positive change in Debtor's assets thereafter is the return to him of ownership of a portion of the Warren Property as part of the divorce settlement. Since the value of that asset is far less than Plaintiff's claim, I find as a fact that the Debtor was insolvent from March 24, 1990 and on all relevant dates thereafter.

### Transfer of the Warren Property

The Plaintiff asserts that the conveyance of the Warren Property was fraudulent under UFCA. The Debtor contends that the Plaintiff's action with respect to his transfer of the Warren property is untimely. That transfer occurred approximately seven years before the Plaintiff filed the present action.

The UFCA contains no particular statute of limitations provision. Citing *Foster v. Evans,* 384 Mass. 687, 429 N.E.2d 995 (1981), Plaintiff argues that the appropriate limitations period is twenty years. Plaintiff misreads *Foster.* The Supreme Judicial Court in that case held that the appropriate limitations period for a UFCA action is that which is "applicable to the underlying claim." *Foster,* 384 Mass. at 697, 429 N.E.2d 995. In other words, the appropriate limitations period on a UFCA action is borrowed from the statute of limitations applicable to the claim which made the plaintiff a creditor in the first place. This rule is said to derive from the longstanding view of Massachusetts courts that fraudulent conveyance actions are "merely a remedy for [the] underlying claim." *Stevens Linen Associates v. Crawford* (*In re Stevens Linen Associates*), 156 B.R. 718, 720 (Bankr.D.Mass. 1993); *see also Desmond v. Moffie,* 375 F.2d 742, 743–744 (1st Cir.1967) (citing *Blumenthal*); *Blumenthal v. Blumenthal,* 303 Mass. 275, 278, 21 N.E.2d 244 (1939) ("The remedy [of avoidance of a fraudulent conveyance] is incidental to the claim."). Thus, for the purposes of the statute of limitations, courts have looked to the underlying claim in determining the "gist" of the subsequent fraudulent conveyance action. *See Stevens Linen Associates,* 156 B.R. at 720. In *Foster,* the underlying claim was on a promissory note made by the defendants. *See* 384 Mass. at 688, 429 N.E.2d 995. In Massachusetts, the statute of limitations on actions upon promissory notes is twenty years. Mass.Gen.Laws ch. 260, § 1.[62] Consequently, the *Foster* court concluded that the limitations period on the subsequent action to rescind the fraudulent conveyance was twenty years as well. *See* 384 Mass. at 697, 429 N.E.2d 995.

Judge Queenan addressed the same issue in *Stevens Linen Associates,* a case in which the debtor in possession, pursuant to 11 U.S.C. § 544(b)[63], sought to avoid

---

**62.** Mass.Gen.Laws ch. 260, § 1 provides, in relevant part:

The following actions shall be commenced only within twenty years next after the cause of action accrues:

. . . .

Actions upon promissory notes signed in the presence of an attesting witness, if brought by the original payee or by his executor or administrator.

**63.** 11 U.S.C. § 544(b)(2) provides, in relevant part:

[T]he [debtor in possession] may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable

certain transfers allegedly fraudulent to three creditors under the UFCA. *See* 156 B.R. at 719. The underlying claims of the three creditors were based upon either contract, such claims having a limitations period of six years, Mass.Gen.Laws ch. 260, § 2, or contract under seal, such claims having a limitations period of twenty years, Mass.Gen.Laws ch. 260, § 1. *See id.* at 721. Relying on *Foster*, Judge Queenan concluded that the avoidance action, filed approximately four-and-a-half years after the transfer, was governed by either the six- or twenty-year statute of limitations and thus, was timely brought. *See id.; Carpenter v. Granderson (In re Granderson)*, 214 B.R. 671, 672 (Bankr. D.Mass.1997).

Plaintiff's underlying claim against Debtor was a legal malpractice action. In Massachusetts, legal malpractice actions are governed by a three-year statute of limitations. Mass.Gen.Laws ch. 260, § 4.[64] Thus, Plaintiff's fraudulent conveyance action is governed by a three-year limitations period as well. As the Plaintiff did not file the fraudulent conveyance action until 1996, this action with respect to the Warren property is time-barred.

### Transfer of the Medford Property

▪ The UFCA was replaced as Massachusetts law by the Uniform Fraudulent Transfer Act ("UFTA"), approved July 8, 1996. The UFTA was in effect at the time of the transfer of the Medford Property. Unlike UFCA, UFTA contains a specific provision detailing when a transfer is made. As to real estate, that time is

> when the transfer is so far perfected that a good-faith purchaser of the asset

from the debtor against whom applicable law permits the transfer to be perfected cannot acquire an interest in the asset that is superior to the interest of the transferee.[65]

That point in time is reached when the deed is recorded, Mass.Gen.Laws ch. 183, § 4, in this case, October 23, 1997. I have found as a fact that the Debtor was insolvent at that time under UFTA, Mass.Gen. Laws ch. 109A, § 3(a). As a result, the first inquiry must be whether the transfer of Debtor's interest in the Medford Property to Defendant was fraudulent because made "without receiving a reasonably equivalent value in change therefor." Mass.Gen.Laws ch. 109A, § 6(a). This is the same test which applies under 11 U.S.C. § 548(a)(1)(B).

Debtor and Defendant assert that the consideration for the transfer was adequate as it arose in the context of their divorce and in termination of marital rights. Plaintiff responds that the divorce, having been granted to non-domicilliaries in the Dominican Republic, is not a true divorce and need not be respected by this Court.[66]

Judge Yacos addressed this issue in *Harman v. Sorlucco (In re Sorlucco)*, 68 B.R. 748, 752 (Bankr.D.N.H.1986):

> [T]his case presents the dilemma of trying to apply fraudulent transfer concepts normally applied in commercial settings ... to the noncommercial context of a divorce proceeding. In the latter context, various subtle and inchoate "property rights" exist between the marital parties but are not clearly defined or actually determined until the event of dissolution of the marriage occurs.[67]

---

> law by a creditor holding an unsecured claim....

**64.** Mass.Gen.Laws ch. 260, § 4 provides, in relevant part:

> Actions of contract or tort for malpractice, error or mistake against attorneys ... shall be commenced only within three years next after the cause of action accrues.

**65.** Mass.Gen.Laws ch. 109A, § 7(1)(i). The Prefatory Note to UFTA indicates that this section is adapted from 11 U.S.C. § 548(d).

**66.** *See* 3 MASS.PRAC., FAMILY LAW & PRACTICE § 26.13 (2d ed.1996).

**67.** To the same effect in another context, *see In re Perry*, 131 B.R. 763 (Bankr.D.Mass. 1991).

He continued and established the standard whereby the adequacy of consideration would be tested in the domestic relations arena:

It must be shown that the property division was the result of arms-length bargaining in the light of the likely range of distribution that the divorce court might order if the matter went to a contested trial. Settlements reached in the shadow of an imminent bankruptcy filing would raise a clear factual question as to the bona fides of such bargaining.

68 B.R. at 754.

■ I join with other courts which have considered the problem in endorsing the analysis used by Judge Yacos. *See, e.g., Falk v. Hecker (In re Falk),* 88 B.R. 957, 967 (Bankr.D.Minn.1988), *aff'd* 98 B.R. 472 (D.Minn.1989); *Webster v. Hope (In re Hope),* 231 B.R. 403, 414–15 (Bankr. D.D.C.1999). Further, as Judge Eisenberg has noted, "in an intra-family transaction, the court places a heavier burden on the transferee to establish fair consideration for the transfer." *Pryor v. Fair (In re Fair),* 142 B.R. 628, 631 (Bankr. E.D.N.Y.1992).

■ While a property settlement can certainly constitute adequate consideration for purposes of UFTA, *Fair, supra; Road Runner Inn, Inc. v. Merrill,* 605 P.2d 776, 777 (Utah 1980), there was nothing "arms-length" about the transactions here. Less than two months after Plaintiff commenced this action, Debtor, acting *pro se,* and his son, representing his mother, prepared the Separation Agreement, which set off the Medford Property to Defendant. The collusive nature of the dealings within the family are further demonstrated by the fact that in another adversary proceeding pending before me in which Plaintiff seeks denial of Debtor's discharge under 11 U.S.C. § 727, *Campana v. Pilavis,* Adv. Proc. No. 98–2097–WCH, Evan is representing not his mother but his father. Under the terms of the Separation Agreement, Debtor was permitted to reside in the Medford Property for a time. There-

after, he removed his residence to an apartment belonging to Defendant's mother. Defendant obtained her divorce decree on February 18, 1997. The deed from Debtor to Defendant, dated March 20, 1997, was recorded October 23, 1997. Debtor filed for relief under Chapter 7 on March 30, 1998.

I find that the transfer at issue here was a vain and misguided attempt to shelter the Medford Property from Plaintiff and Debtor's other creditors. During various preliminary hearings in this case, Debtor repeatedly made the point that he is unfamiliar with bankruptcy law and practice. The manner in which this transfer was handled is further evidence that his plea of ignorance should be well taken. Absent from this entire chronology is the "arms-length" bargaining which is the most essential element of the *Sorlucco* formula. I find the transfer to be fraudulent under the test of UFTA.

## CONCLUSION

For the reasons stated above, I find that the Plaintiff is entitled to prevail in this matter as to the Medford Property only. Because of the peculiar procedure posture of the case, I will not frame my order to encompass relief consistent with that decision. It is now time for the trustee to appear and take appropriate action.